Assault with intent to murder; sentence: eight years imprisonment.
Appellant was charged in a two count indictment with (1) assault with intent to murder David Havard and (2) assault with intent to maim David Havard. The jury found appellant guilty on count one only, and the State nol-prossed count two.
This case arose from a barroom brawl between two off-duty undercover policemen and certain customers of the 1890 Lounge in Dothan, Alabama. Agent David Havard, a Mobile police officer, was on loan to the Dothan Police Department Narcotics Squad as an undercover agent. On the evening of June 3, 1976, appellant was arrested for selling marijuana, based on the undercover work of agent Havard. Appellant was *Page 872 
booked around 9:00 or 9:30 P.M. at the Dothan Jail in Havard's presence. After going off duty around 10:30 P.M., Havard and Dothan police officer Wendell White went to Havard's motel with two other officers and discussed the marijuana case until around midnight. Havard and White then went to the Flamingo Club and had one drink. After the Flamingo closed, the two officers went to the 1890 Lounge.
Appellant had made bond earlier that evening on the marijuana charge and had been released. The State's evidence showed that the appellant and a co-defendant, David Robinette, entered the 1890 Lounge, and as Robinette passed the table where Havard and White were sitting, he cursed Officer White. Robinette rounded a partition into a game room, and White and Havard followed him. Havard testified that Robinette grabbed White as they rounded the partition and at about the same time, he was grabbed from behind by the appellant. A brawl ensued among the four men. Havard testified concerning the assault by appellant as follows:
 ". . . We hit the floor, and when we hit the floor, the subject started kicking me about the head and ribs. Jimmy Earl said that he was going to kill me, that I would never testify against him in Court; that he was going to blind me. He kept trying to dig my eyes out, and hitting me. . . ." (Emphasis supplied.)
Agent Havard, unable to see the assailant because of blood running from his eyes, was struck twice upon the head with a pool cue. The attack upon the officers was so severe that they were forced to roll under a pool table and fire Havard's pistol into the ceiling to stop the brawl and cause the appellant and his companions to leave the club.
Officer White's testimony was essentially the same as Havard's, except for its corroboration of Robinette's assertion that White grabbed Robinette as he "wheeled" toward White, rather than Robinette grabbing White first. White testified that he also was hit with a pool cue by someone and had his eyes gouged by the appellant before he dove under the pool table with Havard.
Officer Havard was hospitalized for four or five days, and received twenty stitches in his head, twenty stitches in his left eyeball, and seventeen stitches in his right eyeball. Photographs of his battered face were put into evidence to show the severity of the attack.
Robinette testified that he neither spoke to White nor saw him in the lounge until he wheeled around and White grabbed him and the brawl ensued. Robinette stated that White grabbed him, knocked him down, and bit a hole in his ear. He said that he got up, took White's gun and threw it over a partition away from the brawl. A picture depicting a serious bite in Robinette's ear was put into evidence. Robinette testified that he never used a pool cue against anyone in the brawl and that he never saw appellant do so.
Appellant testified that just as the disturbance began, he turned and was hit in the mouth with a pool cue by agent Havard. He testified that Havard pushed and tackled him and that he fell on top of Havard. Appellant stated that he hit Havard four or five times with his fist only. He said that he never spoke to Agent Havard during the affray.
 I
Appellant contends that the trial court erred in denying his motion to exclude the evidence on the grounds that the State failed to prove the requisite intent to murder. The State contends that although the evidence indicates that Robinette did the hitting with the pool cue, both appellant and Robinette were involved in the assault. Hence, intent to murder on the part of the appellant may be inferred from Robinette's use of the pool cue as a deadly weapon. The State also argues that because of Havard's temporary inability to see who attacked him with the pool cue, the evidence does not clearly show that it was not the appellant who wielded the weapon. We are unimpressed with this latter argument of the State. Where the State's evidence is unclear as to who committed an assault, the *Page 873 
burden is never upon the defendant to prove that he did not commit the assault, absent proof of a conspiracy.
In an assault with intent to murder, punishable under Title 14, § 38, Code of Alabama 1940, the word "murder" is read to mean as it did at common law, the killing of a rational human being with malice aforethought. Both malice and intent must be proved to the satisfaction of the jury. Jackson v. State,94 Ala. 85, 10 So. 509 (1892); Tolliver v. State, 50 Ala. App. 654,282 So.2d 92 (1973); Douglas v. State, 42 Ala. App. 314,163 So.2d 477 (1963) cert. denied 276 Ala. 703, 163 So.2d 496, reversed on other grounds, 380 U.S. 415, 85 S.Ct. 1074,13 L.Ed.2d 934 (1965). Thus, assault with intent to murder requires evidence of assault with an intent to take life under circumstances which, if successful, would result in murder in either degree. Horn v. State, 98 Ala. 23, 13 So. 329 (1893);Bowen v. State, 32 Ala. App. 357, 26 So.2d 205 (1946). But like malice, intent to take life may be inferred by the jury from the character of the assault, the use of a deadly weapon, and other attendant circumstances. Jackson and Bowen, supra. Intent, being a mental purpose or state of mind, is rarely susceptible of direct proof. Intent, then, may be inferred by the jury from the evidence presented at the trial. And, if the evidence which raises the inference of such intent to take life with malice aforethought is proved to the jury's satisfaction beyond a reasonable doubt, it is their solemn duty to convict.Horn, supra.
The State's evidence was sufficient here to raise a question for the jury as to existence of an intent on the part of appellant to take agent Havard's life. The evidence of the ferocity and of the brutal nature of the attack; the nature and severity of the injuries suffered by Havard; and the surrounding circumstances of the brawl, were sufficient facts from which the jury could infer malice and an intent to take life. Likewise, the jury had every right to believe the assault was committed by the appellant with the intent to kill Agent Havard, from Havard's testimony that "Jimmy Earl said that he was going to kill me. . . ."
The evidence raised an inference of a concert of action on the part of appellant and Robinette. Although it is unclear whether blows struck with pool cues were inflicted by appellant or Robinette, or by both, the jury could have reasonably inferred from the evidence that, "by prearrangement, or on the spur of the moment," the appellant and Robinette entered into a common enterprise or adventure, the purpose of which was to assault the two officers and kill them if they could. Morris v.State, 146 Ala. 66, 41 So. 274 (1906); Howell v. State, Ala.Cr.App., 339 So.2d 138 (1976); Walton v. State, 54 Ala. 317, 307 So.2d 713 (1975).
If a deadly weapon is used, and a conspiracy is found by the jury, it makes no difference in law which assailant wielded the weapon because both are principals. Howell and Walton, supra. The law infers an intent to kill or do grievous bodily harm from the use of a deadly weapon. Williams v. State, 251 Ala. 397, 39 So.2d 37 (1948). A deadly weapon is not necessarily an instrument from which a blow would ordinarily produce death, but one from which, as it was used, death would probably result. The manner of its use and the subject against whom it is wielded, as well as the actual results of its use are to be considered. ". . . [A] deadly weapon is not only a weapon with which death may be easily and readily produced, but one which is likely to produce death or great bodily harm from the manner in which it is used." Williams, supra. A pool cue is not ordinarily thought of as a deadly weapon. However, the jury was entitled to pass upon whether or not the pool cue, as wielded here, was used as a deadly weapon. Many implements of sport, though not designed to be used as deadly weapons, may nevertheless be used in such manner that would cause death, such as a baseball bat, a golf club, horseshoes, etc.
At common law, one could be guilty of assault with intent to murder *Page 874 
where no deadly weapon was used. Bowen, supra. Our cases state that our statute is a codification of the common law. The statute does not create the offense or the constituents of the offense, it merely elevates the crime from a misdemeanor to a felony. Smith v. State, 88 Ala. 23, 7 So. 103 (1890); Lawhon v.State, 41 Ala. App. 577, 141 So.2d 205 (1962). This Court has held a written charge to be improper which stated that an accused could not be convicted of an assault with intent to murder if he used only his fists in the difficulty. Kirkland v.State, 21 Ala. App. 348, 108 So. 262 (1926). Evidence as to appellant's violent assault with his fists therefore presented a jury question as to the existence of a murderous intent, inferable from the character of the assault and attendant circumstances. If there is an assault endangering life, in the absence of facts excusing it, or sufficient provocation, and it is directed against the particular individual named in the indictment, the offense is complete. Meredith v. State, 60 Ala. 441
(1877).
The reconciliation of conflicting testimony is a jury function. Roberts v. State, 49 Ala. App. 729, 275 So.2d 709
(1973). We are of the opinion that the State's evidence as to appellant's intent to take the life of Officer Havard clearly presented a question for the jury, and that it was within the jury's province to ascertain the true facts. The jury could have found that the two off-duty policemen provoked the fight and that the appellant and his companion were defending themselves, and thus not acting in concert in assaulting the officers with intent to kill them. However, they chose to believe the State's evidence instead, which they had a right to do pursuant to the evidence presented.
 II
Appellant next contends that the trial court erred in denying his motion for a new trial on the ground that the appellant failed to receive a fair and impartial trial because of improprieties on the part of one of the jurors.
When the jury was qualified at the beginning of the trial, juror Walter H. Hamrick did not respond to the question as to whether any jurors knew the appellant. At the hearing on the motion for a new trial, Steve Hamrick, the juror's son, testified that he talked with his father at a Zippy Mart on the afternoon of September 20, 1976, and that his father said he would find the appellant guilty because the appellant's father owed him money on a bill. The son then corrected his testimony, stating that he had the conversation with his father at the Zippy Mart on September 25, 1976, and not on the date of the trial, September 20, 1976. He also testified that one James Ray Snow overheard the conversation with his father. Snow testified that while he was in the company of Steve Hamrick he overheard the conversation at the Zippy Mart between Steve Hamrick and his father, Walter Hamrick, on or about September 20, 1976. He testified that Walter Hamrick told Steve that he did not like the appellant at all; that he was on the jury at the time; that appellant's father, whom he knew well, owed him money; and that he was going to find appellant guilty because he did not like him as a person.
Juror Walter Hamrick testified in rebuttal that the conversation with his son at the Zippy Mart occurred a week and a half or two weeks prior to the trial of the appellant. He testified that he never knew the appellant beforehand. On cross-examination he denied saying that the appellant's father owed him a bill, or that he was going to find the appellant guilty.
Mullins v. State, 24 Ala. App. 78, 130 So. 527 (1930) cert. denied 222 Ala. 9, 130 So. 530 (1930), dealt with a motion for a new trial which involved, as a ground of misconduct, the conversation of one of the jurors with a third party in a barber shop after completion of arguments by counsel. Rice, J., in that case wrote:
 ". . . nothing more is presented for review here than a discretionary action in passing on this ground of the motion for a new trial. The trial court heard the evidence pro and con, and, indulging the presumption in favor of the court's decision, *Page 875 
we must hold that there was no error in overruling the motion for a new trial on this ground."
The evidence pertaining to the misconduct of the juror Hamrick, submitted at the hearing on the motion for a new trial, was in conflict. It was the duty of the trial judge to exercise his reasonable discretion in weighing the evidence presented and to reach a decision thereon. His ruling will not be disturbed in the absence of a showing of abuse of discretion, and this Court will indulge in every presumption in favor of the correctness of the ruling of the trial judge.Williams v. State [1977] Ala.Cr.App., 348 So.2d 1113; Clark v.State, 54 Ala. App. 217, 307 So.2d 28 (1975); Adams v. State,32 Ala. App. 367, 26 So.2d 216 (1946). Although the testimony was conflicting, we find that the trial judge's exercise of discretion in making his determination was reasonable, and we therefore will not disturb the trial court's decision.Williams, supra.
In an effort to impeach the jury verdict, the appellant's attorney twice took the witness stand and attempted to testify as to a conversation between himself and a juror. The trial court sustained the State's objections to that testimony.
Affidavits or testimony of third persons concerning statements made to them by jurors, which tend to impeach the jury's verdict, are inadmissible, not only because they are hearsay evidence, but because they invade the protective privilege of secrecy attached to jury deliberations. Harrisonv. Baker, 260 Ala. 488, 71 So.2d 284 (1954); Weatherspoon v.State, 34 Ala. App. 450, 40 So.2d 910 (1949). In certain narrow circumstances, evidence of jury deliberations may be admitted where a juror fraudulently undertakes his position as juror. However, it is clear that such proof is dependent upon establishment of extraneous facts adequate to show a prima facie case of fraudulent jury service sufficient to satisfy the trial judge that light should be let in upon the jury deliberations. Clark v. United States, 289 U.S. 1,53 S.Ct. 465, 77 L.Ed. 993 (1933); Alabama Fuel and Iron Company v.Powaski, 232 Ala. 66, 166 So. 782 (1936). We cannot say from the record before us that the trial court's refusal to admit the attorney's testimony falls within the rule of the Clark
case, supra. No reversible error is shown in the action of the trial judge in denying the motion for a new trial in this instance.
AFFIRMED.
All the Judges concur.